JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
CLIFFORD C. WEBB (CSB No. 260885)
cwebb@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:    415.875.2300
Facsimile:    415.281.1350

Attorneys for Defendant
GROUPON, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GROUPION, LLC., a California limited liability company,<br><br>        Plaintiff,<br><br>   v.<br><br>GROUPON, INC., a Delaware corporation, THE POINT, INC., a Delaware corporation, and GOOGLE, INC., a Delaware corporation,<br><br>        Defendants. | Case No. 3:11-cv-00870-JSW<br><br>**DEFENDANT GROUPON, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR DECLARATORY JUDGMENT, SUMMARY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTION**<br><br>Date:     November 4, 2011<br>Time:    9:00 a.m.<br>Dept.:   Courtroom 11, 19th Floor<br>Judge:  The Honorable Jeffrey S. White |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ........................................................................................... vii

INTRODUCTION ................................................................................................................... 1

FACTS ..................................................................................................................................... 3

    A.    Groupon's Daily Deals Website.................................................................... 3

    B.    Groupon's September 2008 Launch ............................................................ 3

    C.    Groupon's Trademark Registration............................................................ 4

    D.    Plaintiff's Groupware and CRM Software Business ................................. 4

    E.    Plaintiff's Belated Adoption of "GROUPION" ........................................ 5

    F.    Plaintiff's Trademark Registration............................................................ 6

ARGUMENT ......................................................................................................................... 6

I.    LEGAL STANDARDS........................................................................................... 6

    A.    Summary Judgment Standard ..................................................................... 6

    B.    Preliminary Injunction Standard ................................................................ 7

II.    THERE IS NO LIKELIHOOD OF CONFUSION. ............................................. 7

    A.    Plaintiff's Mark Is Weak.............................................................................. 8

    B.    Plaintiff's Software Is Not Even Remotely Related to Groupon's Services........... 9

    C.    The Parties' Marks Differ In Sight, Sound and Meaning. ..................... 12

    D.    Plaintiff's Offers No Admissible Evidence of Actual Confusion As to Source. ....... 13

        1.    Plaintiff's Unsworn "Witness Statement" Is Inadmissible Hearsay. ........ 14

        2.    Plaintiff's "Statement" and Declarations Do Not Show Confusion. ........ 14

        3.    Foreign Confusion Evidence Is Irrelevant. ................................................. 15

        4.    Typos and Misspellings Are Not Evidence of Actual Confusion. ............ 15

    E.    The Parties Use Different Marketing Channels. ..................................... 16

    F.    Prospective Customers Exercise A High Degree of Care..................... 17

    G.    Groupon Had No Intent to Benefit from Plaintiff's Alleged Mark...................... 18

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

H.      No Reasonable Consumer Would Expect the Parties to Expand Into Each Other's Markets........................................................................................................... 19

III.   PLAINTIFF CANNOT ESTABLISH PRIORITY OF USE OVER GROUPON. ........... 20

IV.    GROUPON'S FEDERAL REGISTRATION IS VALID.................................................. 21

V.     PLAINTIFF HAS FAILED TO SHOW IRREPARABLE HARM ................................. 22

       A.      Plaintiff's Reliance on a Presumption of Irreparable Harm is Misplaced. ........... 22

       B.      Plaintiff's Delay Negates Any Claim of Irreparable Harm................................... 23

       C.      Plaintiff Has No Evidence of Harm. ..................................................................... 23

VI.    THE BALANCE OF HARDSHIPS TIPS DECISIVELY IN GROUPON'S FAVOR AS DOES THE PUBLIC INTEREST................................................................. 24

VII.   ANY INJUNCTION SHOULD BE ACCOMPANIED BY AN ADEQUATE BOND ..................................................................................................................... 25

CONCLUSION ........................................................................................................................... 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

CASES

*Accuride Int'l, Inc. v. Accuride Corp.*,
   871 F.2d 1531 (9th Cir. 1989) ................................................................................. 8, 9

*AMF v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ................................................................................. *passim*

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................. 6

*Aurora World, Inc. v. Ty Inc.*,
   719 F. Supp. 2d 1115 (C.D. Cal. 2009) ................................................................. 22

*Autozone Inc. v. Tandy Corp.*,
   373 F.3d 786 (6th Cir. 2004) ................................................................................. 11

*Blankenhorn v. City of Orange*,
   485 F.3d 463 (9th Cir. 2007) ................................................................................. 7

*Blue Ribbon Feed Co., Inc. v. Farmers Union Cent. Exch., Inc.*,
   731 F.2d 415 (7th Cir. 1984) ................................................................................. 19

*Checkpoint Sys., Inc. v. Check Point Software Technologies, Inc.*,
   269 F.3d 270 (3d Cir. 2001) ................................................................................. 17

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
   724 F.2d 1044 (2d Cir. 1983) ............................................................................... 15

*CreAgri, Inc. v. USANA Health Sciences, Inc.*,
   474 F.3d 626 (9th Cir. 2007) ................................................................................. 20

*Curry v. Cal. Dept. of Corr. & Rehab.*,
   2011 WL 855828 (N.D. Cal. Mar. 9, 2011) .......................................................... 14

*eBay v. MercExchange*
   547 U.S. 388 (2006) ......................................................................................... 22, 23

*Edge Games, Inc. v. Elec. Arts, Inc.*,
   745 F. Supp. 2d 1101(N.D. Cal. 2010) ........................................................... vii, 24

*Edge Games, Inc. v. Electronic Arts, Inc.*,
   2010 U.S. Dist. LEXIS 108727 (N.D. Cal. Oct. 1, 2010) ...................................... 7

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) ............................................................................... 19

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
    2011 WL 3659315 (9th Cir. Aug. 22, 2011) .................................................................... 23

*Hasbro, Inc. v. Clue Computing, Inc.*,
    66 F. Supp.2d 117 (D. Mass. 1999),
    *aff'd* 232 F.3d 1 (1st Cir. 2000) ........................................................................ 11

*IAM v. Winship Green Nursing Ctr.*,
    103 F.3d 196 (1st Cir. 1996) .......................................................................... 8

*In re Bose Corp.*,
    580 F.3d 1240 (Fed. Cir. 2009) ....................................................................... 22

*Innospan Corp. v. Intuit, Inc.*,
    2010 WL 5157157 (N.D. Cal. Dec. 3, 2010) ............................................... 7, 22

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*,
    287 F.3d 866 (9th Cir. 2002) ......................................................................... 15

*Lary Harmon Pictures Corp. v. Williams Rest. Corp.*,
    929 F.2d 662 (Fed. Cir. 1991) ........................................................................ 22

*Lydo Enterprises v. City of Las Vegas*,
    745 F.2d 1211(9th Cir. 1984) ............................................................... vii, 3, 4, 23

*Mach. Head v. Dewey Global Holdings, Inc.*,
    2001 U.S. Dist. LEXIS 22759 (N.D. Cal. Dec. 13, 2001) ............................... 19, 20

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ................................................................. 22, 23

*McLaughlin v. Liu*,
    849 F.2d 1205 (9th Cir. 1988) ......................................................................... 7

*Mead Johnson & Co. v. Abbott Labs*,
    201 F. 3d 883 (7th Cir. 2000) ......................................................................... 25

*Mortgage Elec. Registration Sys., Inc. v. Brosnan*,
    2009 U.S. Dist. LEXIS 87596 (N.D. Cal. Sept. 4, 2009) ................................... 22

*Nat'l Steel Car, Ltd. v. Canadian P. Ry., Ltd.*,
    357 F.3d 1319 (Fed. Cir. 2004) ......................................................................... 7

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) ............................................................... *passim*

*Nintendo of Am. v. Lewis Galoob Toys*,
    16 F.3d 1032 (9th Cir. 1994) ........................................................................... 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*One Indus., LLC v. Jim O'Neal Distrib.*,
    578 F.3d 1154 (9th Cir. 2009), *cert denied* 130 S. Ct. 1739 (2010) ........................................ 8

*Oreck Corp. v. U.S. Floor Systems, Inc.*,
    803 F.2d 166 (5th Cir. 1986)................................................................................................ vii, 13

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
    86 F. Supp. 2d 305 (S.D.N.Y. 2000) *aff'd sub nom*,
    *Paco Sport, Ltd. v Paco Rabanne Perfumes*,
    234 F.3d 1262 (2d Cir. 2000) ...................................................................................................... 15

*Perfect 10, Inc. v. Google, Inc*,
    2011 WL 3320297 (9th Cir. Aug. 3, 2011) .............................................................................. 23

*Peterson's Co. v. Christman*,
    900 F.2d 1565 (Fed. Cir. 1990) ............................................................................................ 8, 20

*Pfizer Inc. v. Cody John Cosmetics, Inc.*,
    211 U.S.P.Q. 64 (T.T.A.B. 1981) ....................................................................................... vii, 12

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*,
    657 F.2d 482 (1st Cir. 1981) ...................................................................................................... 15

*Protech Diamond Tools Inc. v. Liao*,
    2009 WL 1626587 (N.D. Cal. 2009)........................................................................................ 23

*RealNetworks, Inc. v. QSA ToolWorks, LLC*,
    2009 WL 2512407 (W.D. Wash. Aug. 14, 2009) .................................................................... 17

*Rearden LLC v. Rearden Commerce, Inc.*,
    597 F.Supp.2d 1006 (N.D. Cal. 2009) ............................................................................. *passim*

*Rodeo Collection, Ltd. v. W. Seventh*,
    812 F.2d 1215 (9th Cir. 1987)...................................................................................................... 8

*SG Services Inc. v. God's Girls Inc.*,
    2007 WL 2315437 (C.D. Cal. May 9, 2007) ........................................................................... 14

*Stanley v. University of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994)........................................................................................................ 7

*Toyota Motor Sales, USA v. Tabari*,
    610 F.3d 1171 (9th Cir. 2010)..................................................................................................... 25

*United States v. Shumway*,
    199 F.3d 1093 (9th Cir. 1999)...................................................................................................... 7

*United Steelworkers of America v. Phelps Dodge Corp.*,
    865 F.2d 1539 (9th Cir. 1989)...................................................................................................... 7

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*Winter v. Natural Resources Defense Council, Inc.*,
    129 S. Ct. 365 (2008) ............................................................................. 7, 22, 23

*Wonder Labs, Inc. v. Procter & Gamble Co.*,
    728 F. Supp. 1058 (S.D.N.Y. 1990) .................................................................... 19

**STATUTES**

15 U.S.C. § 1116 ............................................................................................. 23

15 U.S.C. § 1125(c)(1)-(2) ................................................................................. 24

15 U.S.C. § 1127 ............................................................................................. 22

Lanham Act §§ 44(d) and (e) ............................................................................ 6, 9

**RULES**

Fed. R. Civ. P. 56(d) ........................................................................................ 22

Fed. R. Civ. P. 56(f) .......................................................................................... 8

Fed. R. Civ. P. 65(c) ........................................................................................ 25

**OTHER AUTHORITIES**

*McCarthy on Trademarks and Unfair Competition* § 29:21 ...................................... 10

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

## <u>SUMMARY OF ARGUMENT</u>

2   Plaintiff's Motion for Summary Judgment should be denied because Plaintiff cannot show

3   either (i) a likelihood of confusion or (ii) that it has prior rights in its mark to Groupon. As to

4   likelihood of confusion, each of the eight *Sleekcraft* factors favors Groupon. *AMF v. Sleekcraft*

5   *Boats*, 599 F.2d 341 (9th Cir. 1979); *Rearden LLC v. Rearden Commerce, Inc.*, 597 F.Supp.2d

6   1006 (N.D. Cal. 2009). First, Plaintiff's mark is not well known or strong. Second, Plaintiff's

7   commercial software product is not related to Groupon's deal of the day service. Third, the

8   marks differ in sight, sound and meaning—with contrasting logos, different meanings, and

9   different pronunciations. *Pfizer Inc. v. Cody John Cosmetics, Inc.*, 211 U.S.P.Q. 64 (T.T.A.B.

10  1981). Fourth, Plaintiff has offered no admissible or credible evidence of actual confusion

11  despite years of co-existence. *Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166 (5th Cir.

12  1986). Fifth, the parties use different marketing channels, apart from both parties' use of the

13  Internet, which is insufficient. *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*,

14  638 F.3d 1137 (9th Cir. 2011). Sixth, prospective business users of both Plaintiff and Groupon

15  are sophisticated and likely to exercise considerable care. Seventh, Groupon had never heard of

16  Plaintiff and had no intent to trade on its mark. Finally, no reasonable consumer would believe

17  that Plaintiff would start offering discounted consumer goods or services or that Groupon would

18  provide complex commercial software. This failure on each *Sleekcraft* factor bars summary

19  judgment and injunctive relief. Likewise, Plaintiff cannot establish priority of use to Groupon, as

20  neither it nor its product were called "Groupion" at the time Groupon launched. This is similarly

21  fatal to both summary judgment and a preliminary injunction. Plaintiff has also failed to show

22  that Groupon's trademark registration was procured by fraud.

23   Regarding the preliminary injunction motion, Plaintiff has also offered no proof of

24  irreparable harm. *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101(N.D. Cal. 2010).

25  Further, Plaintiff's delay, failure to show irreparable harm, and the balance of hardships all

26  warrant denial of the preliminary injunction motion. *Id.*; *Lydo Enterprises v. City of Las Vegas*,

27  745 F.2d 1211(9th Cir. 1984).

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## INTRODUCTION

Three years ago, Groupon—whose name is derived from "group" and "coupon"—launched a website featuring daily discounts on great things to do and buy, like whale watching, yoga lessons, and Indian food.  What made Groupon different was its "group buying" model, in which a minimum number of consumers had to sign up before anyone could get the deal.  Groupon's "deal of the day" business immediately became popular with web savvy shoppers, and today the company employs nearly 10,000 people and is preparing for an initial public offering.

Apart from the fact that (like virtually all businesses today) Plaintiff Groupion also uses the Internet, Plaintiff's business has nothing in common with Groupon.  Plaintiff is a German-owned corporate software company that has never offered a consumer product or service, much less a "group coupon."  Instead, it provides what it calls "business groupware and CRM"—software used internally by businesses to allow multiple employees to work on related tasks and manage their customer data.  Contrary to Plaintiff's unsubstantiated arguments, Groupon offers nothing of the sort.  And unlike "Groupon," Plaintiff's Groupion® name—in which "ion" is highlighted separately from "group"—does not rhyme with or suggest the word "coupon."

Despite the obvious differences in its name and the fact that its business is entirely unrelated to Groupon's deal of the day offerings, Plaintiff now hopes to exploit the happenstance that the parties' names contain common letters, and cash in on what it hopes will be the deal of a lifetime.  After delaying suit for over two years, and further delaying its preliminary injunction motion for six months, Plaintiff has now brought its motion on the eve of Groupon's IPO, apparently hoping that the *in terrorem* threat of injunctive relief will land it a quick payout.

Plaintiff's motions must be denied, however, because Plaintiff cannot establish a likelihood that the source of its commercial software product will be confused with Groupon's completely unrelated services.  Forced to concede that there is no risk of confusion as to source from Groupon's discount offerings to consumers, Plaintiff resorts to mischaracterizing a handful of services Groupon provides to listing merchants as "customer relationship management" or "CRM" software.  In fact, all of Groupon's merchant services are geared toward helping set up and process a Groupon deal on Groupon.com successfully.  None of these services are software or

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

"CRM" by any stretch of the imagination, and none of them can possibly compete with Plaintiff.

In addition to the contrast in the parties' offerings, all of the remaining *Sleekcraft* factors cut decisively in Groupon's favor: Plaintiff's weak mark is entitled to only narrow protection, as it is virtually unknown in this country, and is only one of many "Group"-prefixed marks in the corporate groupware market; Groupon had never heard of Plaintiff and had no ill intent when adopting its name; the parties' names are notably different in sight, sound and meaning; their offerings are sold to different purchasers in different ways; the purchasers are sophisticated and exercise care and—contrary to the single hearsay "statement" from a foreign customer—there is not a shred of evidence of actual *trademark* confusion, despite years of co-existence.

And if that were not enough, at the time Groupon launched its website, *Plaintiff was not even called "Groupion."* Plaintiff only announced its change from the name "i-sense" in the U.S. after Groupon launched, and Plaintiff's own records show that it first released a product called "Groupion" even later. Plaintiff's efforts to show otherwise rest on intentionally vague declarations and even backdated websites, which purport to show the distribution in 2007 of software that did not exist until the end of 2008 or later. Accordingly, Plaintiff cannot establish priority, and its motions must be denied for this reason as well.

Likewise, Plaintiff's assertion that Groupon fraudulently claimed use of "in commerce" in its trademark registration is legally misguided and factually baseless. Groupon was offering deals "in commerce" as required for a trademark registration from its very first offer on October 21, 2008. Nothing in Groupon's trademark application was false, much less intentionally aimed at deceiving the trademark office, as Plaintiff's cancellation claim requires.

Based on these fundamental flaws, Plaintiff is not entitled to summary judgment. Its preliminary injunction motion must also be denied for its failure to show either a probability of success or even serious questions going to the merits. That motion also fails due to Plaintiff's thirty month delay in bringing it, which alone negates any claim of irreparable harm. And even if it did not, plaintiff has failed to show any evidence of irreparable harm, resting instead on a "presumption" that the law no longer makes available. By contrast, Groupon, its customers, and thousands of employees would suffer tremendous harm by imposition of the requested injunction

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

against Groupon's longstanding use of its name.  For all these reasons, both the motions for summary judgment and preliminary injunction are without merit and should be denied.

### FACTS

**A.    Groupon's Daily Deals Website**

Groupon, Inc. ("Groupon") is the world's leading "deal of the day" website.   Each day Groupon provides its subscribers with discounted offers on goods and services—commonly referred to as "Groupons"— through its website at www.groupon.com, by email, and on mobile devices.   Declaration of Nick Cioffi in Support of Defendant's Opposition ("Cioffi") ¶¶ 2, 18-26. A typical deal might feature a $20 Groupon that can be redeemed for $40 in value at a restaurant, spa, car wash, or other merchant.  *E.g*., Cioffi Exs. 1-3 (representative Groupons).

**B.    Groupon's September 2008 Launch**

Groupon started in September of 2008 in Chicago as a spin-off of an earlier website called The Point.  The Point was a platform for people to create campaigns addressing large-scale problems that cannot be solved alone.  *Id*. ¶ 3.  To do this, the Point developed "tipping point" technology; only when enough people pledge support do the campaigns "tip" and the people make their contributions.  *Id*. ¶¶ 3-4.  Groupon was created as a commercial spin-off, focusing on the benefits of group buying to get discounts.  *Id*. ¶ 4.  Tied to this concept, the name "Groupon," also conceived in September 2008, was created by combining the words "group" and "coupon." *Id*.  Deals on Groupon are only valid if enough people sign up and the deal "tips."  *Id*. ¶¶ 4-5

At the time Groupon's name was created, no one at Groupon had ever heard of Plaintiff Groupion, LLC ("Plaintiff"), or any affiliated company.  *Id*.  This is not surprising, since at the time Groupion, LLC did not exist, the German company owned by Plaintiff was called "i-sense" and operated through "nextgroupware.com," and there was no European or U.S. trademark application or registration for GROUPION.  *Id*.; Declaration of Jedediah Wakefield in Support of Defendant's Opposition ("Wakefield") Exs. 1-3.

Starting in September 2008, Groupon began promoting its name and service to potential merchants and consumers.  Cioffi ¶ 6.  On September 24, 2008, Groupon first launched a website under the "Groupon" name, with a "teaser" page offering a description of the Groupon service

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

and soliciting consumers to sign up to receive offers on "Groupons." *Id.* ¶¶ 7-8; Ex. 4. Groupon received 271 subscribers in its first week. *Id.* ¶ 8; Ex. 5. By early October, Groupon had signed up a number of merchants to offer deals on its website. *Id.* ¶ 6. After nearly a month of promotion using the Groupon name, Groupon offered its first deal on October 21, 2008 for 2 for 1 pizza, and has continued offering deals thereafter. *Id.* ¶ 10; Ex. 6. In support of its business, Groupon began nationwide advertising on Google on October 28, 2008, and by October 31, 2008 it already had visits to its website from across the country. *Id.* ¶¶ 11-12; Exs. 7-9.

Groupon soon became an Internet phenomenon. Currently, Groupon has over one hundred million subscribers, operates in 45 different counties, has sold over 90 million Groupons, and employs over 9600 people. *Id.* ¶¶ 15, 17. In December 2010, it was reported that Groupon rejected a $6 billion offer from Google to buy it. Wakefield Ex. 8. On June 2, 2011, Groupon announced plans for an initial public offering. *Id.* Ex. 11.

## C. Groupon's Trademark Registration

Groupon filed its U.S. trademark application for "Groupon" on March 10, 2009, and the registration issued on September 22, 2009. Dkt.36-2. The application was published for opposition on July 7, 2009, and Plaintiff filed no opposition. The USPTO granted the registration despite Plaintiff's pending application for "GROUPION," apparently finding no risk of confusion given the obvious differences in the parties' marks and offerings.

## D. Plaintiff's Groupware and CRM Software Business

In stark contrast to Groupon's offerings, Plaintiff's product is a complex integrated business groupware and customer relationship management ("CRM") suite of software aimed at IT professionals in sophisticated businesses. *Id.* Ex. 14. The top line of Plaintiff's own homepage thus aptly encapsulates its business and sole product as "Business Groupware and CRM for the Cloud,"—with an image of a cloud and the term "ion" both depicted in green. *Id.* Ex. 15. Groupware is "software that enables users to work collaboratively on projects or files via a network. *See* www.merriam-webster.com/dictionary/groupware. Plaintiff's online descriptions of its product confirm this, claiming that Groupion "helps companies and project teams work together and execute different tasks within one integrated working environment." *Id.* Ex. 14.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Plaintiff's software offers features like a group calendar, allowing teams to coordinate their schedules; email and telephony integration; accounting functions; task and case management for working times and service incidents; business lead management; and resource management, including logistical tracking of stock, reclamations, and assembly processes. *Id.* Ex. 17 (Groupion Features). Although Plaintiff now suggests its software is simply about "offers," Groupion is a complex infrastructure software product for businesses to manage their internal operations and customer relations.

### E.   Plaintiff's Belated Adoption of "GROUPION"

Plaintiff Groupion, LLC was founded on January 24, 2011 in the office of its litigation counsel, Jack Russo, less than a month after Groupon's well publicized rejection of Google's $6 billion offer. *Id.* Ex. 10. The next day, Plaintiff was assigned the trademark registration for the Groupion mark from its co-founder, and filed suit shortly after that. *Id.* Ex. 23.

Plaintiff's founders, Peter-Christoph Haider and Benjamin Coutu, are citizens and residents of Germany. In 2005, they started "i-sense." Dkt. 32 [Declaration of Peter Christoph-Haider ("Haider")] ¶ 7. Although Plaintiff registered the *domain name* groupion.net in mid-2007 (*Id.* Ex. 6), Plaintiff offered its "i-sense Groupware Suite" software on "nextgroupware.com;" "Groupion" was not the name of any product or company at the time. *Id.*; Wakefield Exs. 1-4.

Although Plaintiff's declarations refer to all versions of its product as "Groupion," it was not even called "Groupion" until after Groupon had launched and was advertising nationwide. It was not until at least October 22, 2008—after Groupon was already offering deals—that Plaintiff announced on an English language blog that it was changing its name from "i-sense," and it was not until November 11, 2008 that Plaintiff first released a product called Groupion (rather than i-sense Groupware Suite). Wakefield Exs. 1-4. Crucially, either date falls *after Groupon's September 2008 start date and its first deal on October 21, 2008.* Cioffi ¶¶ 6-10.

Moreover, even after releasing the first "Groupion" offering in November 2008, Plaintiff was still targeting only European customers, with all pricing in Euros. Wakefield Ex. 19. It was not even until November 2009—more than a year *after* Groupon launched—that Plaintiff first incorporated Groupion Software, Inc., a Canadian company. Haider Ex. 1 at 2 (claiming role at

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Groupion Software, Inc. since 11/2009).

To evade this issue, Plaintiff claims to have offered "a version of the GROUPION software application on various download portals" in 2007. Haider ¶ 17; Exs. 9a-9c. Tellingly, however, Plaintiff does not state what this "version" was actually called, and fails to mention that it was providing free versions of the "i-sense Groupware Suite." Wakefield ¶¶ 4-9; Ex 7. To confuse the issue further, Plaintiff points to date-restricted Google search results purporting to date a copy of "Groupion" software to November 27, 2007. Haider ¶ 17; Ex. 9c. But results of Google searches within a date range prove nothing, since the contents of pages can change after they are indexed by Google. Using this same search method, one can find news about "President Obama" from 1999 or the 9/11 attacks from the year 2000. Wakefield Ex. 5. By contrast, the "Change Log" incorporated into Plaintiff's sworn interrogatory answers demonstrates that the versions claimed to be posted on these "portals" in 2007 *were not even in existence* until after Groupon's launch in October of 2008. *See* Haider Exs. 9a-9b, Wakefield ¶¶ 5-6; Ex. 4 (Change Log showing release of version 3.0 in November 2008).

### F.   Plaintiff's Trademark Registration

Plaintiff's U.S. registration for GROUPION was filed December 22, 2008 and issued July 13, 2010. Wakefield Ex. 24. The registration was based solely on a prior European registration for that same mark dated November 27, 2008. *Id*. Ex. 22. Plaintiff claims priority to that date based on § 44(d) and (e) of the Lanham Act, a narrow exception to the rule that parties may not obtain U.S. registrations on the principal register without use in commerce. *Id*. Moreover, Plaintiff's U.S. registration improperly claimed rights in connection with goods or services not claimed in its European trademark registration. *Compare id*. Ex. 25 *with* Ex. 22.

### ARGUMENT

## I.   LEGAL STANDARDS

### A.   Summary Judgment Standard

To prevail on its motion for summary judgment, Plaintiff, as the moving party, bears the heavy burden of showing that no genuine dispute over any material fact exists regarding any of the elements of Plaintiff's trademark infringement claim. *See Anderson v. Liberty Lobby, Inc.*,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

477 U.S. 242, 247 (1986). In determining whether Plaintiff has met this burden, all justifiable inferences must be drawn in Groupon's favor. *See Blankenhorn v. City of Orange,* 485 F.3d 463, 470 (9th Cir. 2007). A "justifiable inference" is not necessarily the most likely inference or the most persuasive inference. *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989). Rather, an inference in favor of the non-moving party should be drawn so long as it is "rational or reasonable." *Id.* Summary judgment is always inappropriate if reasonable jurors, drawing all such inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor. *United States v. Shumway*, 199 F.3d 1093, 1103-04 (9th Cir. 1999). If conflicting evidence exists as to any material fact, summary judgment must be denied. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

### B. Preliminary Injunction Standard

A preliminary injunction is a "drastic and extraordinary remedy that is not routinely granted." *Innospan Corp. v. Intuit, Inc.*, 2010 WL 5157157, *1 (N.D. Cal. Dec. 3, 2010) (citing *Nat'l Steel Car, Ltd. v. Canadian P. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004). A preliminary injunction may only be entered "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 375-76 (2008). A plaintiff seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Edge Games, Inc. v. Electronic Arts, Inc.*, 2010 U.S. Dist. LEXIS 108727, at *28 (N.D. Cal. Oct. 1, 2010), citing *Winter*, 129 S. Ct. at 374. The Supreme Court requires plaintiffs to demonstrate that irreparable injury is *likely* in the absence of an injunction, not merely "possible." *Winter*, 129 S. Ct. at 375. Where, as here, the injunction would disturb the status quo, the Court "should deny such relief unless the facts and law clearly favor the moving party." *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).

## II. THERE IS NO LIKELIHOOD OF CONFUSION.

Critical to both Plaintiff's summary judgment and preliminary injunction motions is the claim that Groupon is infringing Plaintiff's mark. In evaluating claims for infringement or unfair

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

competition arising out of the use of a mark, courts apply the same "likelihood of confusion" test. *See Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1538 at n. 7 (9th Cir. 1989). Likelihood of confusion requires that confusion be *probable*, not simply possible. *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987). Plaintiff must establish that confusion as to source or origin is likely among an *appreciable number* of potential customers. *IAM v. Winship Green Nursing Ctr.*, 103 F.3d 196 (1st Cir. 1996).

    As discussed below, all eight *Sleekcraft* factors traditionally considered in determining whether a likelihood of confusion exists cut decisively in Groupon's favor. *AMF v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).[1]

### A.   Plaintiff's Mark Is Weak.

    Weak marks are only entitled to a "restricted range of protection." *Sleekcraft*, 599 F.2d at 350. Plaintiff claims that its name suggests "nothing related to software." To the contrary, "Group" suggests "groupware" and "ion" suggests the "cloud."[2] In fact, there are numerous other GROUP-prefixed marks in use and registered with the PTO specifically for related software, such as GROUPWARE TECHNOLOGY, GROUPLINK, and GROUPMAX. Wakefield Exs. 27-28. Such widespread use of similar marks for related services is compelling proof of the mark's weakness. *Rearden LLC v. Rearden Commerce*, 597 F.Supp.2d 1006, 1020 (N.D. Cal. 2009).

    Moreover, apart from "conceptual strength," the strength of a mark must also be measured by its *market* strength. *One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1164 (9th Cir. 2009), *cert denied* 130 S. Ct. 1739 (2010) (after placing mark on spectrum of distinctiveness, "the second step is to determine the strength of this mark in the marketplace"). But Plaintiff's Motion is devoid of any evidence that Groupion is known by anyone in the U.S. The declarations Plaintiff provides are all from people in Europe, not the U.S.,[3] and none of them describe specific

---

[1] Indeed, given the complete absence of any evidence showing a likelihood of confusion, it is well within the Court's discretion to grant summary judgment of non-infringement in Groupon's favor now. Fed. R. Civ. P. 56(f).

[2] Apart from its obvious meaning in chemistry, "ion" also suggests the ionosphere. Given the popularity of "cloud" computing, a number of software companies have similarly adopted "cloud" based marks, such as Cumulus Technologies and Nimbus Data. Wakefield Exs. 29-30.

[3] Under the doctrine of territoriality, which is fundamental to trademark law, rights exist in each country solely according to that country's laws, and the acquisition of trademark rights in a foreign country does not create priority in the U.S. *Peterson's Co. v. Christman,* 900 F.2d 1565,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

marketing activities reaching this country.  A search on Google for news articles about Plaintiff or its products comes back with zilch.  Wakefield Ex. 26.  There is no evidence Plaintiff has spent a single advertising dollar in the U.S., has ever made a sales call here, or—until incorporating in Mr. Russo's office immediately before filing suit—had offices here.  The complete absence of evidence of customer recognition *in the U.S.* further undermines any self-serving claim that Plaintiff's mark is strong.  In combination, the widespread use of similar marks, coupled with Plaintiff's lack of marketing efforts and recognition in the U.S. entitles Plaintiff to at most narrow protection.

### B.      Plaintiff's Software Is Not Even Remotely Related to Groupon's Services.

Related services are those that "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348.  Even where marks are identical or nearly identical, such as Delta (for airlines and faucets), Infinity/Infiniti (for stereos and cars), and Lexus/Lexis (for cars and information services), they can comfortably coexist without infringement. *See Accuride*, 871 F.2d at 1537 (no confusion despite identical ACCURIDE mark for drawer slides and wheel rims).

Here, Plaintiff's argument that it is in competition with Groupon is preposterous.  German corporate groupware companies are not known for giving consumers 50% off dim sum, Pilates lessons, or doggy day care.  Key to what Groupon offers is a marketplace where consumers can buy discounts on third party consumer goods and services—something they cannot possibly do with Plaintiff's product, which offers no access to buy third party offerings.  Instead, Plaintiff's software "helps project teams work together and execute different tasks with one integrated working environment"—something no one can get from Groupon.  Cioffi ¶¶ 39-45; Wakefield Ex. 14.  Groupon deals are bought by consumers looking for savings on interesting things to do, while Plaintiff's software is purchased by corporate IT decision-makers hoping to streamline complex internal operations.  Thus, the parties' offerings are used for entirely different functions, are not complementary, and are purchased by different classes of purchasers.[4]

---

1568-69 (Fed. Cir. 1990) (prior use of trademark in Japan gives no right to priority in U.S.).

[4] Plaintiff cannot rely on the broad description of goods in its trademark registration—obtained solely under Section 44 of the Lanham act—to prove infringement.  Section 44 permits a foreign

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Conceding that there is no conflict created by Groupon's actual business of offering local discounts, Plaintiff resorts to grossly mischaracterizing a handful of Groupon merchant services, radically altering how it describes its own services, and discussing the parties' offerings at absurd levels of abstraction. *First*, Plaintiff makes a wholly unsubstantiated claim that Groupon is now offering "CRM software," pointing to Groupon's "deal optimization" and "capacity planning" services. But Groupon's "deal optimization" service is not software at all. It is simply a *conversation* between Groupon and a merchant about how to design a successful Groupon deal. Cioffi ¶¶ 46-54. And Groupon's capacity planning tools are simply online forms merchants can fill out to help them decide the right number of Groupons to offer (too many and a restaurant might be over-whelmed). Neither of these nor any of Groupon's services are CRM software. *Id.*

As the name suggests, CRM software is used to *manage customer relationships* across various parts of a company. Accordingly, a central feature of CRM software is the ability to associate different types of information *with a specific customer* and to track that customer's purchasing history, customer service issues, and preferences and sales initiatives, among other things. *Id.* But with Groupon, there is no way for a merchant to enter, store, or retrieve customer names, addresses, purchasing history, or other customer information. No Groupon listing merchant could even attempt to use Groupon's services as a substitute for CRM software, because (among other reasons) Groupon does not tell merchants who the customers are.

*Second*, although Plaintiff now describes its software as a tool to create "internet-based marketing campaigns" (Motion at 3), throughout its actual marketing materials Plaintiff describes its software as "business groupware." Groupware is not marketing campaign software, but rather is software that enables groups of employees to collaborate. Wakefield Exs. 14, 20-21.

---

applicant to obtain a registration without showing use in commerce, but it is not an exception to the rule that a Plaintiff must prove a likelihood of confusion to prevail in an infringement case. *See McCarthy on Trademarks and Unfair Competition* § 29:21. Unless the foreign applicant has actually entered the market for particular goods or services, customers will not be faced with confusingly similar marks on them. *Id.* Here, Plaintiff is not only unable to prove that it used its mark in commerce before Groupon, but *even today* Plaintiff has not used its mark on almost any of the overbroad categories of goods and services claimed in its registration. *Compare* Wakefield Ex. 4 (Response to Interrogatory No. 2) *with* Ex. 24 (registration).

1    Plaintiff cannot show proximity of goods by singling out an isolated function of its

2    groupware platform related to "marketing campaigns," while ignoring the purpose of its software:

3    to help "business and project teams implement the full range of interdivisional and enterprise-

4    wide functions and processes with one integrated platform." *Id*. Ex. 16; *see Autozone Inc. v.*

5    *Tandy Corp.*, 373 F.3d 786, 798 (6th Cir. 2004) (small overlap between products offered in stores

6    not sufficient to show proximity); *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp.2d 117, 122

7    (D. Mass. 1999), *aff'd* 232 F.3d 1 (1st Cir. 2000) (no confusion where overlap was with respect to

8    a small component of the overall product).

9    In all events, Groupon has never offered marketing campaign software of any kind, much

10   less a comprehensive platform to allow business teams to work on business functions.  Groupon

11   only offers discounts that consumers can purchase through Groupon, and all of its merchant

12   services are subordinate and ancillary to that.

13   *Third*, Plaintiff attempts to describe both parties as "software as a service" and "cloud"

14   computing companies.  But this is just another way of saying that both parties use the Internet.

15   People today can do just about anything online—check in on their kids' homework , schedule an

16   oil change, and even file briefs with this Court—from their computers.  At a certain level of

17   abstraction, these activities all involve software running on websites, and thus could be called

18   "software as a service," or "cloud computing."  But despite this over-generalized description, no

19   consumer would expect services provided by an elementary school, a mechanic, and a federal

20   court to come from the same source.

21   *Rearden LLC v. Rearden Commerce*, 597 F. Supp. 2d 1006 (N.D. Cal. 2009), relied on by

22   Plaintiff, is highly instructive on this point.  In *Rearden*, Plaintiff argued that defendant was a

23   close competitor because defendant was a "technology infrastructure company" and both parties

24   used "cloud computing."  The Court rejected this argument as a matter of law:

25       Plaintiffs label defendant's business at an extraordinarily high level of abstraction
         as "a technology infrastructure company."  This description conflates a means with
26       an end.  It is true that each party relies to some extent on technology infrastructure
         to support its business platform; however, the end services produced by plaintiffs
27       and defendant are completely different…

28

GROUPON'S OPP. TO MOTIONS FOR SUM.               11               CASE NO. 3:11-CV-00870-JSW
JUDG. AND PRELIMINARY INJUNCTION

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

> Similar logic compels the court to reject plaintiffs' argument that defendant's
> primary business is "Cloud Computing"— a term used to describe a software-as-a-
> service (SAAS) platform for the online delivery of products and services.  . . .
> Once again, plaintiffs erroneously conflate a platform by which defendant
> launches its end services to consumers (i.e., software) with the end product itself
> (i.e., a web-based marketplace).

*Rearden*, *supra*, 597 F. Supp.2d at 1020-21.  Here, as in *Rearden*, Plaintiff attempts to conflate the means by which Groupon offers services (computers, software, and the web) with the end product itself (a market for consumers to find great deals).  Such a theory was insufficient to defeat summary judgment *against* a plaintiff in *Rearden*, and is clearly inadequate here.

**C.     The Parties' Marks Differ In Sight, Sound and Meaning.**

Similarity of marks is "tested on three levels: sight, sound and meaning," all of which weight in Groupon's favor.  *Sleekcraft* at 351.  With respect to appearance, Plaintiff regularly presents its mark in two colors, with "group" in black and "ion" in green, highlighting that it is composed of these two words.  Indeed, this banner appears atop each page on Plaintiff's website:



Wakefield Exs. 14-15.  As this shows, Plaintiff displays its mark with the "G" capitalized and the remaining characters in lower case.  It does this in its User Manual, its compendium, and on its signs it displayed at a German tradeshow.  Haider Ex. 13 at 2; Wakefield Ex. 16.  In contrast, on its website Groupon's name is typically presented in white lettering on a black background, in a thicker type, and in capital letters:

**GROUPON**

With respect to sound, the differences are even more notable.  Groupon is a two syllable word that rhymes with coupon.  Plaintiff's mark, in contrast, is three syllable word that indisputably sounds different.  While Plaintiff claims that it does not say "group ion," it fails to explain why the public would not do so when Plaintiff highlights "ion" as a separate word.  What matters is how consumers would pronounce the mark, not how Plaintiff claims it should be pronounced.  *Pfizer Inc. v. Cody John Cosmetics, Inc.*, 211 U.S.P.Q. 64 (T.T.A.B. 1981) ("It is not possible for a trademark owner to control how purchasers will vocalize its mark").

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   Purchasers seeing plaintiff's website would reasonably pronounce it "group ion."

2        Finally, the marks differ significantly with respect to meaning.  While it is a coined word,

3   GROUPON is an obvious play on "group coupon."  "Groupion" has no similar meaning or play

4   on words (there is, after all, no such thing as a "coupion").  Instead, Plaintiff's name evokes

5   groupware and the cloud.  Wakefield Ex. 16.  Not surprisingly, the trademark office, in

6   categorizing the GROUPON mark for search purposes, used the term "group coupon" to do so

7   while categorizing "GROUPION" with the phrase "group ion."  Wakefield ¶ 33; Ex. 31.

8        Plaintiff attempts to gloss over these major differences, instead repeating the argument

9   that the marks must be "virtually identical" because they differ by "a single letter."  Motion at 10.

10  But the number of different characters in two words does not determine their similarity.  As this

11  Court likely recognizes, not all "patent" attorneys are "patient."

12       **D.     Plaintiff's Offers No Admissible Evidence of Actual Confusion As to Source.**

13       Although proof of actual confusion is not required, a long period of co-existence without

14  confusion weighs strongly against finding a likelihood of confusion.  *See, e.g.*, *Oreck Corp. v.*

15  *U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (no confusion over 17 months was

16  "highly significant").  Of critical importance, only confusion "with respect to the source of the

17  parties' *products* or *services*" is relevant.  *See, e.g., Rearden*, 597 F. Supp. 2d at 1023 (emphasis

18  in original).  Confusion about the parties' names without actual confusion as to which party is the

19  source of specific goods or services is simply irrelevant.  *Id*. at 1023-24 (rejecting evidence of

20  actual confusion because "a closer examination of plaintiffs' evidence . . . reveals that in each

21  case, confusion occurred with respect to the parties *names* or affiliation, but never occurred with

22  respect to the source of the parties' *products or services*.").  In making this determination, the

23  focus must be placed on "whether *prospective purchasers* are likely to be deceived" not other

24  industry members or general members of the public.  *Id*. at 1023 (emphasis in original).

25       Plaintiff's points to a handful of examples purportedly representing actual confusion: (i) an

26  unsworn (and inadmissible) statement of Mr. Kuhlenkamp, the Sales Coordinator for a Danish

27  sporting goods company, and (ii) evidence of typos and misspellings of Defendant Groupon's

28  name on the Internet.  Neither of these demonstrates any legally relevant confusion as to source.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**1.      Plaintiff's Unsworn "Witness Statement" Is Inadmissible Hearsay.**

The only evidence as to an actual confusion "witness" comes in the form of a hearsay "statement" not signed under penalty of perjury.  *See* Haider Ex. 17.  Where a declaration fails to make this attestation, it is inadmissible on summary judgment or to support a preliminary injunction motion.  *SG Services Inc. v. God's Girls Inc.*, 2007 WL 2315437 (C.D. Cal. May 9, 2007) (declaration not signed under penalty of perjury inadmissible to support summary judgment); *Curry v. Cal. Dept. of Corr. & Rehab.*, 2011 WL 855828 (N.D. Cal. Mar. 9, 2011) (letter offered in support of preliminary injunction inadmissible).  For this reason alone, Plaintiff's proffered evidence of customer confusion must be rejected.

**2.      Plaintiff's "Statement" and Declarations Do Not Show Confusion.**

Moreover, the "statement" of Mr. Kuhlenkamp would not demonstrate any legally relevant confusion.  *See* Haider Ex. 17.  Mr. Kuhlenkamp acknowledges that when he saw internet references to discount coupons they "were obviously referring to groupon.com, and had nothing to do with the Groupion software."  No confusion there, from the person apparently responsible for buying Plaintiff's product.  Rather, his statement claims confusion because when

> "I tried to explain to my colleagues that we are going to use Groupion to manage our coupons, we had quite some arguments, as some people thought we are planning to use "Groupon" to issue city-deal coupons.  It took me some time to explain that "Groupion" and "Groupon" are two completely different businesses."

Haider Ex. 17.  Apart from being inadmissible double hearsay as to what other people (not responsible for purchasing decisions) said, this statement does not demonstrate any confusion as to the source of products or services as required under the Lanham Act.   Rather, the only confusion claimed is that when Mr. Kuhlenkamp told his unnamed colleagues that he was planning to use Plaintiff's services for something entirely new, these unnamed colleagues initially thought he was referring to using Groupon to offer daily deals.  Even if admissible, this would not show confusion as to whether Groupon offers CRM software, or whether Plaintiff offers deals.  Rather, it would show confusion as to what Mr. Kuhlenkamp was talking about.  Muddled conversation is not the type of confusion as to source that the Lanham Act is meant to prevent.  *See Rearden*, 597 F. Supp. 2d at 1023.

Fenwick & West LLP
Attorneys at Law
Mountain View

Similarly, the *identically worded* declarations from Plaintiff's two owners that "we began to hear our customers call us in confusion" and "it is also clear to me that actual confusion is growing" are completely improper opinion testimony, pure hearsay, and far too vague and conclusory to form competent evidence that actual confusion has occurred.  Haider, Coutu, ¶¶ 26, 38  *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1052-53 (2d Cir. 1983) (reversing injunction where only confusion evidence was conclusory affidavit of plaintiff's executive director); *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 875 n.1 (9th Cir. 2002) (rejecting hearsay statements in affidavits on summary judgment).

### 3. Foreign Confusion Evidence Is Irrelevant.

Even assuming (contrary to fact) that any of this hearsay could show actual confusion as to source, it would be evidence pertaining to *foreign consumers* in a *foreign market*, and thus irrelevant. *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 320 (S.D.N.Y. 2000) *aff'd sub nom, Paco Sport, Ltd. v Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000) (as foreign nationals had no knowledge of market conditions in the U.S., their beliefs had no relevance in ascertaining confusion of American consumers).  As such, these statements cannot support Plaintiff's requests for summary judgment or preliminary injunction.[5]

### 4. Typos and Misspellings Are Not Evidence of Actual Confusion.

Typos and misspellings do not represent any confusion as to the source of a specific goods or services, and thus do not represent actual confusion under trademark law.  *See, e.g.*, *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 489 (1st Cir. 1981) (misspelling not evidence of confusion but, at most, evidence that the two words were very close in spelling); *see also Rearden*, 597 F. Supp. 2d at 1023 (misdirected emails are not confusion as to source relevant under Lanham Act).  Typos, however, are precisely what Plaintiff offers.  Plaintiff trots out a number of examples of misspelling as purported evidence of actual confusion.  Dkt. No. 31 at 10; Haider Ex. 18 (webpage referring to "GROUPION COUPON DISCOUNT" on a photography class); *Id*. ¶ 43 (obvious typo on Groupon website and Facebook); *Id*. ¶ 44 ("blog"

---

[5] Other than Kuhlenkamp, Plaintiff fails to identify any actual confusion witnesses or their location, and they do not report even purported customer confusion in the U.S.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   news article inaccurately stating that "Groupon" filed this lawsuit); *Id.* Ex. 17 (typo which did

2   *not* confuse Mr. Kuhlenkamp, who recognized it as "obviously referring to a groupon coupon").

3         As typographical errors, none of these evidence actual confusion.   At most they represent

4   confusion as to how a word is spelled or a simple slip of the finger—particularly given that  "i"

5   sits between "o" and "u" on the keyboard.  Moreover, even if this showed confusion (it does not)

6   it would not be confusion by *prospective customers*, but irrelevant confusion of random people

7   posting information on the Internet.  *Rearden*, 597 F. Supp. 2d. at 1023 ("The critical

8   determination for finding a likelihood of confusion is whether *prospective purchasers* are likely

9   to be deceived, regardless of the experiences of vendors, industry insiders, or job-seekers.").

10        Finally, Plaintiff's allegations that Google asks searchers "Did you mean *groupon*?" while

11   still displaying search results for "groupion," is no evidence of confusion. Haider Exh. 19.  This

12   question is generated automatically by Google's spelling algorithms to alert users based on likely

13   spelling mistakes.  Dkt. 22 at 1-2.  People who did not mean Groupon can simply ignore the

14   question and look to the next line—the link to Plaintiff's website.  *Id.; see Network Automation,*

15   *Inc. v. Advanced Systems Concepts, Inc*., 638 F.3d 1137 (9th Cir. 2011) ("the owner of the mark

16   must demonstrate likely confusion, not mere diversion.")

17        In sum, Plaintiff and Groupon have coexisted for over two and a half years, yet there is

18   not a single instance of confusion by an actual customer as to the *source* of the parties' respective

19   offerings.  This factor therefore strongly cuts against a finding of likelihood of confusion.

20   **E.      The Parties Use Different Marketing Channels.**

21        While the Ninth Circuit has held that "[c]onvergent marketing channels increase the

22   likelihood of confusion" (*see Sleekcraft*, 599 F.2d at 353), it is not enough that the parties both

23   use the web.  Plaintiff grudgingly acknowledges this, noting that "some courts have recognized

24   that this factor has diminished in importance as companies have ubiquitously turned to the

25   Internet for marketing."  Motion at 18 n.3.  This is not just the opinion of "some courts."  It is

26   controlling law in the Ninth Circuit, reiterated most recently in *Network Automation*.  There, the

27   court again adopted the common sense conclusion that "the shared use of a ubiquitous marketing

28   channel does not shed much light on the likelihood of consumer confusion."  *Network*

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*Automation*, 638 F.3d at 1151 (reversible error for district court to find that this factor favored finding of infringement simply because two companies used the Internet for advertising); *see also Rearden*, 597 F. Supp. 2d. at 1024 (rejecting the argument that this factor favored a finding of infringement). Yet the bare assertion that both Plaintiff and Groupon use the Internet as a marketing tool is all that Plaintiff offers. Motion at 18-19.

Beyond the common use of the Internet, the contrast in the parties' marketing channels is stark. Groupon engages in substantial TV, radio, and billboard advertising. *See* Cioffi ¶ 55. Plaintiff does not. *See* Wakefield Ex. 4 No. 5. Plaintiff touts its attendance at two tradeshows in Germany (*once not even using the name Groupion*). *See id.* No. 5. Groupon has never participated in such events. Plaintiff claims to have put software on free download pages. Groupon has not. Cioffi ¶ 57. Because the parties' marketing channels share nothing beyond use of the Internet, this factor weighs strongly against a likelihood of confusion.

## F. Prospective Customers Exercise A High Degree of Care.

The type of goods and degree of care exercised by a typical consumer are highly relevant for assessing a likelihood of confusion. *Network Automation*, 638 F.3d at 1152. While courts generally look to the typical buyer exercising ordinary caution, "[w]hen the buyer has expertise in the field, a higher standard is proper. . . ." *Id.* (quoting *Sleekcraft*, 599 F.2d at 353). Similarly, it is understood that "sophisticated consumer[s] of business software,"—like Plaintiff's—will generally exercise a higher degree of care than a typical consumer. *Id.*; *see also, Checkpoint Sys., Inc. v. Check Point Software Technologies, Inc.*, 269 F.3d 270, 285 (3d Cir. 2001) (consumers of electronic security systems and firewall software generally sophisticated and unlikely to be confused ); *RealNetworks, Inc. v. QSA ToolWorks, LLC*, 2009 WL 2512407 (W.D. Wash. Aug. 14, 2009) (same, for sophisticated consumers that utilize technical software ).

Whether this factor focuses on those who might purchase Plaintiff's CRM software or merchants who might offer discounts on their goods and services through Groupon (Motion at 19), both sets of buyers exercise a high degree of care. Typically, the types of businesses that would purchase Plaintiff's type of integrated business software are sophisticated to begin with. Plaintiff's own description of its software demonstrates this, touting it for "complex billing

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Fenwick & West LLP
Attorneys at Law
Mountain View

processes;" logistical tracking of stock, procurement, reclamation and assembly; and the coordination of business tasks between multiple employees. Wakefield Exs. 16-17.  Plaintiff specifically markets itself to IT decision-makers, using technical jargon such as "23 object classes," "Access POP3 and IMAP accounts," "LDAP support," and "integration versioning system. "  *Id*. Ex. 17.  The sophisticated audiences for such materials are likely to exercise care in making purchasing decisions.

Moreover, Plaintiff's software hosts information about businesses' customers remotely, in "the cloud," for use in customer relations management features.  *See, e.g.*, Haider ¶¶ 6, 9; Wakefield Ex. 16 ("[a]s a web-based application, data storage takes place centrally on the Groupion storage server").  Naturally, businesses are likely to be careful before handing over all their customer information to a third party.  Recognizing this, Plaintiff touts its security— specifically that it "invests a large amount of our budget in cutting edge hardware components" to "ensure your data's safety," and employs encrypted data transfer and tunneling. *Id*. 16, 18.

While it involves completely different services, the decision of a merchant to offer discounts on Groupon is likewise not an impulse buy.  The decision typically involves deciding on an amount of a discount, what exactly it will and will not cover, the number of Groupons to offer and what restrictions should accompany the offer.  Cioffi ¶ 36.   Such decisions are not made in haste; but typically involve person-to-person contact with an actual Groupon representative, or first watching training materials to explain the listing process.  *Id*. ¶ 35.

Ignoring these facts, Plaintiff suggests that people using the Internet exercise a low degree of care.  The Ninth Circuit has squarely rejected this argument, noting that courts must look beyond the medium of the Internet into the nature of the particular goods and the relevant purchasers.  *Network Automation*, 638 F.3d at 1152 (reversing district court for improperly relying on outdated authorities finding that "Internet users on the whole exercise a low degree of care.")  This factor thus cuts strongly against a finding of a likelihood of confusion.

### G.      Groupon Had No Intent to Benefit from Plaintiff's Alleged Mark.

There is no evidence that Groupon had knowledge of Plaintiff's existence at the time if adopted the GROUPON name, much less that Groupon knowingly adopted its mark intending to

trade on Plaintiff's goodwill.  GROUPON came from a new idea of combining "group" and "coupon," and no one at Groupon had heard of Plaintiff when they chose the name.  *See* Cioffi ¶ 4.  Indeed, at the time, neither Plaintiff nor its product were even called GROUPION, Plaintiff had not filed a trademark registration anywhere in the world, and Plaintiff's German business, operating at *nextgroupware.com*, was called "i-Sense."  *Id*.  The suggestion that Groupon should have foreseen that Plaintiff would someday choose to change its name is absurd. [6]

Apart from demanding clairvoyance, Plaintiff's only other argument as to intent is that Groupon did not cede to Plaintiff's demands in this lawsuit brought over two years later.  Motion at 20.  However, the failure to stop using a mark after receiving a demand letter or lawsuit is not evidence of bad faith intent.  *See Wonder Labs, Inc. v. Procter & Gamble Co.*, 728 F. Supp. 1058, 1064 (S.D.N.Y. 1990) (failure to comply with cease and desist letter "is absolutely no proof that the defendant acted in bad faith to capitalize on the plaintiff's trademark").  Groupon can hardly be said have acted with intent to trade on Plaintiff's name merely because it rejected Plaintiff's demands.  As such, this factor, like all others in the *Sleekcraft* test, tips in Groupon's favor.

## H.    No Reasonable Consumer Would Expect the Parties to Expand Into Each Other's Markets.

While a "strong possibility that either party may expand [its] business to compete with the other will weigh in favor" of a likelihood of confusion (*Sleekcraft*, 599 F.2d at 354), Plaintiff must come forward with competent evidence proving this likelihood.  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1152 (9th Cir. 2002).  The determination of whether such expansion is likely is based on a reasonable consumer's expectations, not the mere ambitions of Plaintiff.  *Blue Ribbon Feed Co., Inc. v. Farmers Union Cent. Exch., Inc.,* 731 F.2d 415, 422 (7th Cir. 1984) (mere hope of expansion insufficient).  A plaintiff's late created expansion will not show a likelihood of expansion for analysis of infringement.  *See, e.g., Mach. Head v. Dewey Global Holdings, Inc.*, 2001 U.S. Dist. LEXIS 22759, at *12-13 (N.D. Cal. Dec. 13, 2001)  (refusing to

---

[6] That Groupon's has filed trademark lawsuits against companies with similar names has no bearing on this analysis.  Motion at 20.  None of the suits have anything to do with Groupon's knowledge of Plaintiff, and each involves companies in Groupon's same deal of the day market, not the entirely different enterprise groupware and CRM market occupied by Plaintiff.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

consider recent expansion towards defendant's market because it was not likely, at the time

defendant began using its mark, that plaintiff would expand into defendant's market).

Here, reasonable consumers would not look at Plaintiff's specialized, integrated business

software and think that Plaintiff is likely to start offering discounted cupcakes anytime soon,  or

that Groupon would suddenly begin offering CRM and enterprise groupware to manage

businesses' billing, procurement, reclamation and assembly, or other business tasks.

Plaintiff's assertion that Groupon's purchase of a mobile application company somehow

changes this is unfounded.  Participation in today's mobile internet "sector" is almost as

ubiquitous as the desktop internet.  Groupon has developed mobile tools not for intracompany

groupware, but to get deals to consumers.  Cioffi ¶¶ 18, 25, 29.  That a Groupon customer with an

iPhone can now find a good deal on a nearby shop in no way suggests that Groupon is about to

launch into business software.  Although Groupon is a growing business, it is entirely focused on

providing discounted deals on fun and interesting things for consumers to do.  *Id.* ¶ 27.[7]

## III.   **PLAINTIFF CANNOT ESTABLISH PRIORITY OF USE OVER GROUPON.**

Priority of use by Plaintiff is a prerequisite to its claim of infringement.  *CreAgri, Inc. v.*

*USANA Health Sciences, Inc.*, 474 F.3d 626, 630 (9th Cir. 2007).  Separate and apart from

Plaintiff's failure to establish any likelihood of confusion here, Plaintiff cannot prove that its first

genuine use of the GROUPION name *in commerce* for its products in the U.S. predates Groupon.

Plaintiff's "evidence" consists of registration of a URL containing the word "groupion," (which

was not the name of the company or product at that time) (Haider ¶¶ 14-16 ); claims that Plaintiff

gave away free versions of its software (also failing to mention that the software was not called

"Groupion" at the time) (Haider ¶ 17, *see also* §I.E, *supra*); and unexplained conclusory

allegations of solicitation of investment and marketing.  Haider ¶¶ 18-19.

Moreover, prior foreign use, even if established, would not establish priority for a U.S.

trademark.  *Peterson's Co,* 900 F.2d at 1568-69 (prior use of trademark in Japan gave no right to

claim priority in U.S.).  As such, even if Plaintiff's "conceptualizing," fund raising, and preparing

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

---

[7] The unconfirmed, hearsay, speculative quote attributed to Tim O'Shaghnessy that expansion into business software could be "an opportunity" (Motion at 9) is not "evidence" of anything.

to do business were enough to create trademark rights (they are not), such activities do not create rights in the U.S.  The same is true of Plaintiff's purported September 2008 launch of its rebranded Groupion website, which was apparently announced solely to existing German customers, and is contradicted by Plaintiff's own documents announcing the change in the U.S. on October 22, 2008.  Wakefield Ex. 1.

Plaintiff also submits declarations from former employees in Germany, all cagily claiming, in lock step fashion, that at unidentified dates during their employment, "the company was engaged in a number of marketing, sales, and promotional activities using the 'GROUPION' name and trademark." *See, e.g.,* Dkts.35, 40-42, 44- 46.  But none of these declarations states when "GROUPION" *was actually used in commerce*, and none describe any activities that *reached the U.S.*  In view of evidence that Plaintiff first announced its name change in the U.S. on October 22, 2008, and did not actually release a product called "Groupion" until November 11, 2008, Plaintiff cannot show superior U.S. rights.  Wakefield Exs. 1-4.

Groupon on the other hand was effective in reaching out to customers beginning on September 24, 2008 with a webpage offering a description of the Groupon service using the GROUPON name, soliciting customers to sign up to receive offers.  Cioffi ¶¶ 7-8; Ex. 4 (archived copy of this first website).   Groupon received 271 subscribers in its first week. *Id.* ¶ 8; Ex. 5.  By early October, Groupon had already signed up a number of merchants to offer deals on its website, and after nearly a month of promotion using the Groupon name, Groupon offered its first deal of the day on October 21, 2008. *Id.* ¶¶ 6, 10; Ex. 6. *All of this took place prior to Plaintiff's apparent rebranding of its software as Groupion in the United States*.  This on its face is fatal to Plaintiff's motion for summary judgment and request for preliminary injunction.

## IV.    **GROUPON'S FEDERAL REGISTRATION IS VALID**

Plaintiff separately moves for declaratory judgment cancelling Groupon's federal trademark registration on the basis of fraud on the trademark office.  This claim fails completely because it (1) relies on a fundamentally flawed interpretation of the "commerce" requirement of the Lanham Act, (2) mischaracterizes Groupon's early use of its mark, which was in "commerce," and (3) fails to show any intent by Groupon to deceive the trademark office.

Fenwick & West LLP
Attorneys at Law
Mountain View

*First*, 15 U.S.C. § 1127 defines "commerce" as "all commerce which may lawfully be regulated by Congress."  This does not require services to be delivered in multiple states, or across state lines.  *See Lary Harmon Pictures Corp. v. Williams Rest. Corp.*, 929 F.2d 662 (Fed. Cir. 1991) (single-location restaurant satisfied use in commerce requirement).  *Second*, under any definition of "commerce," Groupon's earliest activities met it.  From its very first deal, Groupon was using its mark with deals that, although redeemable in Chicago, were promoted nationally and appealed to out of state residents.  Cioffi ¶¶ 7-14.  Within days of its October 21 launch, Groupon's website had been visited by people from all over the country.

*Third*, to cancel for fraudulent procurement, Plaintiff must point to more than inaccuracy; it must prove intent to deceive the trademark office by clear and convincing evidence.  *In re Bose Corp.*, 580 F.3d 1240 (Fed. Cir. 2009).  Here, Plaintiff does not even pretend to meet this standard.  Its summary judgment motion is meritless.[8]

## V.   PLAINTIFF HAS FAILED TO SHOW IRREPARABLE HARM

### A.   Plaintiff's Reliance on a Presumption of Irreparable Harm is Misplaced.

Plaintiff's "irreparable harm" argument relies on a "presumption" of irreparable harm that no longer applies.  Several courts considering the issue have found that the presumption is defunct following the Supreme Court's decisions in *eBay v. MercExchange* 547 U.S. 388 (2006) and *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365 (2008).  *See, e.g., Innospan Corp.*, 2010 WL 5157157 (irreparable harm cannot be presumed in trademark actions); *Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1167-69 (C.D. Cal. 2009) (*eBay* rule that irreparable harm cannot be presumed applies to preliminary injunctions in the trademark context); *Mortgage Elec. Registration Sys., Inc. v. Brosnan*,  2009 U.S. Dist. LEXIS 87596, *23-24 (N.D. Cal. Sept. 4, 2009) (trademark case finding *Winter* "has effectively eliminated the presumption").

In one post-*eBay* case, the Ninth Circuit found no abuse of discretion where a district court had applied the old rule and no one had challenged its application.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009).

_____

[8] Although Groupon submits that Plaintiff's summary judgment motion should be denied on this record, if the Court is inclined to consider granting it in whole or in part, Groupon seeks relief pursuant to Fed. R. Civ. P. 56(d) to permit it to take further discovery  Wakefield ¶¶ 35-46.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

However, two recent Ninth Circuit decisions, *Perfect 10, Inc. v. Google, Inc,* 2011 WL 3320297 (9th Cir. Aug. 3, 2011) and *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 2011 WL 3659315, *7 (9th Cir. Aug. 22, 2011), have cautioned against any reliance on *Marlyn* for this proposition. These decisions make clear what the district court decisions above have held—that courts may no longer rely on older authorities finding a presumption of irreparable harm.[9]

### B.   Plaintiff's Delay Negates Any Claim of Irreparable Harm

Any claim of irreparable harm is negated where the moving party delays in moving for a preliminary injunction.  *See Lydo Enter. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984) (delay "implies a lack of urgency and irreparable harm.").  Here, Groupon has been offering daily deals since October 2008, and it applied to register its U.S. trademark in March 2009.  Nevertheless, Plaintiff waited until late February 2011 before bringing suit, and then waited nearly six months longer before filing this motion.  This delay alone negates any claim of immediate and irreparable harm.  *Protech Diamond Tools Inc. v. Liao*, 2009 WL 1626587 (N.D. Cal. 2009) (24 month delay in suit and 4 month delay before motion "alone is sufficient to undermined Plaintiff's claim of immediate, irreparable harm.")

### C.   Plaintiff Has No Evidence of Harm.

Apart from conclusory argument, Plaintiff offers no *evidence* of any harm, much less harm that is irreparable.  Plaintiff has not cited a single lost sale, nor any purchases based on confusion.  Nor has Plaintiff pointed to anything beyond conjecture as to loss of goodwill or harm to its brand.  Instead, Plaintiff repeats its complaint that Groupon's popularity makes its name less distinctive—because people searching for it on Google see information about Groupon (just as

---

[9]In *Flexible Lifeline*, 2011 WL 3659315, the Court found that *Marlyn's* "summary treatment of the presumption without consideration of the effect of *eBay* and *Winter* does not bind this panel or constitute an affirmation of the presumption's continued vitality." *Id.* at *8.  Similarly, in *Perfect 10*, after finding that the presumption of irreparable harm in copyright cases had "been effectively overruled" by *eBay*, the court in a footnote addressed *Marlyn*, cautioning that "[u]nder *eBay*, courts must analyze each statute separately to determine whether Congress intended to make 'a major departure from the long tradition of equity practice' and create a statutory presumption or categorical rule for the issuance of injunctive relief." *Perfect 10*, 2011 WL 3320297, *4 n.2.  Applying the same rule here, nothing in the Lanham Act suggests that Congress intended such a major departure.  Rather, the statue discusses injunctions in discretionary terms. 15 U.S.C. § 1116 (decision to grant injunction governed by traditional "principles of equity").

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   searches of "Delta" for faucets also yields information about airlines).[10]  This does not prove any

2   confusion as to source or harm to Plaintiff that is cognizable under the Lanham Act.

3   **VI.   THE BALANCE OF HARDSHIPS TIPS DECISIVELY IN GROUPON'S FAVOR
        AS DOES THE PUBLIC INTEREST**

4

5       While vague in its terms, the injunction Plaintiff proposes would bar use of Groupon's

6   name in virtually any manner that involves "software," "e-commerce applications," or "mobile

7   phone applications," among other things, during the pendency of this litigation.  Dkt. No. 31-1 at

8   15-16.[11]  As so defined, Plaintiff effectively seeks a shutdown of Groupon's use of its brand, and

9   the name of the product it sells—*i.e.*, Groupons.  Such a restriction would be devastating.

10      During the two and half years of Plaintiff's delay, Groupon has invested heavily in its

11  brand, building a company of nearly 10,000 employees with countless city-specific websites and

12  operations around the world.  Over 100 million subscribers use and enjoy services under the

13  Groupon brand and have bought over 90 million Groupons.  Cioffi ¶¶ 15, 17.  The sweeping

14  injunction Plaintiff seeks would destroy that investment and inflict irreparable harm on

15  Groupon's relationships with its customers and merchants.  Given Plaintiff's timing of this

16  motion, on the eve of Groupon's IPO, the mere threat of inflicting this hardship pending trial

17  seems to be exactly what Plaintiff hopes will extract a windfall settlement.

18      The public interest particularly disfavors an injunction where the moving party's delay

19  would exacerbate the negative impact on the public and the prejudice to the enjoined party.  *See,*

20  *e.g., Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1118 (N.D. Cal. 2010).  Here the

21  proposed injunction would effectively halt the global operations of a multibillion dollar company,

22  endanger the jobs of its 9600 employees, eliminate a source of useful discounts to consumers, and

23  disrupt a promotional platform that benefits hundreds of small businesses.  Cioffi ¶¶ 15-17.  On

24  the other side of this public interest calculus, if the status quo is left as is, certain of Plaintiff's

25  customers who are already searching for it by name will occasionally see information about

26  ---
[10] Plaintiff's real complaint seems to be that its mark is being "diluted."  Motion at 23.  But

27  Lanham Act protection against dilution is statutorily limited to famous marks.  *See* 15 U.S.C. §
    1125(c)(1)-(2).  Plaintiff's mark has never been famous, and thus it has no dilution claim.
    [11] Plaintiff's requested injunction is vastly overbroad.  *Id.* If any relief could be appropriate, it

28  could proscribe only selling CRM or enterprise groupware, not all Groupon's internet activities.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Groupon and its deal of the day offerings. Even if they inadvertently click on a Groupon link, they will immediately see that it is not a commercial software company, and will simply click the back button. *See Toyota Motor Sales, USA v. Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010) (consumers "skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents [and] fully expect to find some sites that aren't what they [first] imagined"). Both the balance of hardships and public interest cut strongly against an injunction.

**VII.   ANY INJUNCTION SHOULD BE ACCOMPANIED BY AN ADEQUATE BOND**

No preliminary injunction may issue unless "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The purpose of this bond requirement is twofold: first, to ensure that a party that has been enjoined from some action that they are legally entitled to take has a source of compensation, and, second, to dissuade plaintiffs form "requesting injunctions on tenuous legal grounds." *Nintendo of Am. v. Lewis Galoob Toys*, 16 F.3d 1032, 1036 (9th Cir. 1994). Because the bond represents the *only* source for recovery if the injunction is later dissolved, it is essential that it represent the full value of damage suffered. *Id.*; *see Mead Johnson & Co. v. Abbott Labs*, 201 F. 3d 883, 888 (7th Cir. 2000) (explaining why "when setting the amount of security, district courts should err on the high side"). While Plaintiff has failed to show any basis for an injunction here, if it could, a bond of at least $5 billion dollars would be warranted given the injunction Plaintiff seeks. Wakefield Exs. 8-9, 12-13.

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, Groupon respectfully requests that Plaintiff's Motions for Declaratory Judgment and Summary Judgment and Request for Preliminary Injunction be denied.

Dated:   August 29, 2011

FENWICK & WEST LLP

By: _____ */s/ Jedediah Wakefield* _____
          Jedediah Wakefield
          Attorneys for Defendant GROUPON, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW